IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

**IN RE KYLEE T.**

**Appeal from the Chancery Court for Shelby County**
**No. CH-22-0212     James R. Newsom, Chancellor**

_____

**No. W2025-01055-COA-R3-PT**

_____

In this case involving termination of the mother's parental rights to her child, the Shelby County Chancery Court ("trial court") determined that one statutory ground for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JEFFREY USMAN and VALERIE L. SMITH, JJ., joined.

Anna L. Phillips, Germantown, Tennessee, for the appellant, Starquesha T.

Laurie W. Hall, Memphis, Tennessee, for the appellees, Kenneth P. and Sandra P.

**OPINION**

I. Factual and Procedural Background

This case focuses on Kylee T., the minor child ("the Child") of Starquesha T. ("Mother") and Kenneth P. ("Father"). Father and his wife, Sandra P. ("Stepmother"), have been married since 1984 and are the petitioners in this action (collectively, "Petitioners"). The Child was born in December 2014 after Father had engaged in an extramarital relationship with Mother. Father testified at trial that when Mother became pregnant with the Child, he did not believe that he was the father of the Child but initially paid child support to Mother to keep the relationship a secret. During the termination trial, Stepmother testified that she became aware of the Child's existence in 2018 when she

received a telephone call from Mother, who informed her that the Child was Father's biological child. Stepmother then told Father that he "had to do what's right by this child," and they decided to complete a home DNA test.

Stepmother explained that she met the Child for the first time when she arranged to meet Mother to collect a DNA sample from the Child. However, the home DNA test was negative. When Mother questioned the result, the parties underwent another test through Child Support Services. Before Petitioners learned the result of the DNA test, they received a call in November 2018 from a Child Protective Services ("CPS") worker who informed them that Father was definitely the Child's father and advised Petitioners that the Child was about to enter foster care. According to Stepmother, she and Father decided to bring the Child into their home at that time. Father met the Child for the first time when the Child and K.T., Mother's younger daughter from another relationship, came to live with Petitioners in November 2018.

On January 3, 2019, the Department of Children's Services ("DCS") filed a petition in the Shelby County Juvenile Court ("juvenile court") alleging that the Child and K.T. were dependent and neglected in Mother's care. DCS averred that Mother had abandoned the Child and K.T. because Mother had contacted DCS and explained that she could not provide a home for them due to an arrest warrant charging her with child abuse of her eldest child, N.T. On the same day, the juvenile court entered a protective custody order, awarding custody of the Child to Father and custody of K.T. to DCS. The juvenile court placed both children in Petitioners' care. Father subsequently filed an intervening dependency and neglect petition.

Following a hearing conducted on August 19, 2019, the juvenile court magistrate dismissed the dependency and neglect petitions in an order entered on September 17, 2019. Meanwhile, Mother had contacted Father on August 21, 2019, and they had agreed that the Child and K.T. would reside with Petitioners during the week and with Mother on the weekends. Mother testified at trial that she had made this arrangement with Petitioners to enable the Child and K.T. to attend a Head Start program that was close to Petitioners' home. Although K.T. later returned to reside with Mother full time, the Child continued to reside with Petitioners during the week.

The guardian *ad litem* appointed by the juvenile court filed a petition for rehearing of the dependency and neglect petitions. Following a *de novo* hearing, the juvenile court entered an order on September 15, 2020, adjudicating the Child and K.T. dependent and neglected as to Mother and K.T.'s father pursuant to Tennessee Code Annotated § 37-1-102(b)(13)(C) and (F).[1] The juvenile court found evidence of domestic violence in Mother's home and of Mother's drug use in front of the Child and K.T. The juvenile court

---

[1] The juvenile court judge appointed a special judge to preside over the rehearing in the juvenile court judge's absence.

also noted that Mother had pled guilty in July 2019 to charges of child abuse and assault. The juvenile court awarded custody of the Child to Petitioners and custody of K.T. to DCS while allowing Mother supervised visitation with both children.

Mother appealed the dependency and neglect adjudication to the Shelby County Circuit Court ("circuit court"). The circuit court entered an agreed order on December 17, 2020, dismissing DCS's dependency and neglect petition at DCS's request. The circuit court granted a continuance of Father's intervening petition and modified the co-parenting schedule between Mother and Father. Under the new schedule, Mother was to have visitation with the Child for three weekends each month from Friday at 6:00 p.m. through Sunday at 6:00 p.m. and for a week at Christmas. The court directed Father to drop off and pick up the Child at Mother's home. The circuit court returned K.T. to Mother's custody.

On April 29, 2021, Father filed a petition in the juvenile court for custody of the Child, requesting that he be named the primary residential parent and that Mother be awarded "a reasonable schedule for parenting time." Father averred that he had filed a voluntary nonsuit of his intervening dependency and neglect petition in February 2021 and that he had "properly made [the Child] available to return to Mother's home with the hope he would have visitation both in person and via telephone or computer." However, Father alleged that "Mother [had] denied any and all communication between [the Child] and her Father" since March 2021. Father subsequently filed a motion requesting temporary physical custody of the Child. Following a hearing, the juvenile court entered a temporary order on June 4, 2021, designating Father as the primary residential parent for the Child and awarding to Mother visitation on alternate weekends.

On August 5, 2021, the juvenile court conducted a hearing and ruled that Mother was to have no contact with the Child, "either in person or by telephone/text, electronically or by social media or coming on or near the property where said child may be located." According to the trial court's final judgment, this no-contact order stemmed from the following incident:

> In July 2021, while [the Child] was with Petitioners, [K.T.] told Mother that [N.T.] had hit her, resulting in a cut on her back. Mother testified in Juvenile Court that when she asked [N.T.] what had happened, he slapped her. Mother admitted hitting [N.T.] with an open hand across his face, bloodying his nose. Mother was indicted on a charge of criminal abuse for that incident. For that, Mother pled guilty to one count of Child Abuse and Neglect, a type A misdemeanor on May 25, 2023. Mother was sentenced to one year of supervised probation. DCS removed the three children who resided with Mother, [N.T.], [K.T.], and [B.T.], from her custody in July 2021.

(Internal citations to record omitted.) The Child has remained in Petitioners' sole custody since the no-contact order became effective on August 5, 2021.[2] Mother filed a motion to modify visitation on December 2, 2021, requesting that the no-contact order be lifted, but the juvenile court denied the motion in an order entered on January 7, 2022.

Petitioners filed their petition to terminate Mother's parental rights to the Child and for stepparent adoption in the trial court (chancery court) on February 17, 2022. Petitioners alleged against Mother the statutory grounds of (1) abandonment by failure to visit in the four months preceding the filing of the petition, (2) abandonment by failure to financially support the Child in the four months preceding the filing of the petition, and (3) persistence of the conditions leading to removal of the Child from Mother's home. Petitioners further alleged that it was in the Child's best interest for Mother's parental rights to be terminated.

On April 25, 2022, Mother filed an answer to the termination petition, denying all substantive allegations and requesting dismissal of the petition. Mother subsequently filed a "Notice of Affirmative Defense Pursuant to Tenn. R. Civ. Pro. 8.03," presenting the affirmative defense that any failure to visit the Child had not been willful due to the no-contact order that was in place. Mother's notice did not mention an affirmative defense applicable to the statutory ground of failure to financially support the Child. Upon Mother's proof of indigency and her former counsel's withdrawal, the trial court appointed current counsel to represent her. The court also appointed attorney Ada Johnson as guardian *ad litem* ("GAL") to represent the Child's best interest. Petitioners filed an "Affidavit to Establish Financial Ability," indicating monthly income totaling $13,326.00 and a monthly surplus after expenses of $1,759.00.

The trial court conducted a bench trial on April 14, 2024. Petitioners announced that they would not pursue the ground of abandonment by failure to visit. Father, Stepmother, and Mother each testified. Additionally, Mother presented testimony by James Fields, a DCS family services worker who had assisted Mother and her family since 2022. The Child testified in chambers with counsel for all parties present but without the parties themselves present. The parties stipulated to the accuracy of juvenile court records introduced as exhibits at trial.

Petitioners also presented documents related to Mother's criminal record. In addition to the child abuse charge stemming from the July 2021 incident with N.T., Mother had pled guilty in July 2019 to one count of misdemeanor assault and one count of misdemeanor child abuse or neglect. Mother also had previously pled guilty to a charge of assault in 2013. In its final order, the trial court noted that Mother had been "arrested on a recent charge of assault" as well. Father and Stepmother had each obtained one-year, no-contact orders of protection against Mother, issued by the Shelby County General

---

[2] Although the no-contact order was effective as of the August 5, 2021 hearing, the trial court did not enter the written order until September 28, 2021.

Sessions Court ("general sessions court") in January 2025 upon findings that Mother had stalked Petitioners and "threatened to harm" Father.

Mr. Fields testified that since the July 2021 incident that caused Mother's other three children (N.T., K.T., and B.T.) to be removed from her home, Mother had fulfilled requirements of a permanency plan developed with DCS, including completing a parenting assessment, parenting classes, anger management classes, and counseling. Mother had to provide information regarding her counseling to have the no-contact order lifted concerning the Child's siblings. According to Mr. Fields, Mother had succeeded in having the no-contact order lifted as to K.T., and after successful supervised visits and a trial home visit, the juvenile court had returned K.T. and B.T. to Mother's custody by the time of the instant termination trial. N.T. remained in foster care, and Mother was enjoying unsupervised visits with him. Mr. Fields reported that he had visited Mother's home and had not observed any drug use or criminal activity. He also indicated that Mother had completed her supervised probation and had not been the subject of any further referrals for child abuse since the July 2021 incident. Mr. Fields testified that Mother appeared to be more patient with N.T. and K.T. than she had been in the past.

As to child support, Mother received some support payments from Father before the Child was placed in Petitioners' care. Mother acknowledged that she had never made any child support payments to Petitioners. Mother testified that when she delivered the Child to Petitioners' home in June 2021, the Child had in her possession a cellular telephone ("cell phone"), case for the cell phone, and a smart watch. Mother maintained that she continued to pay the $100.00 monthly bill for the Child's cell phone until February 2025. Mother did not produce any documentary proof of having paid the cell phone bill, and she acknowledged that she had not spoken to Father concerning the cell phone. It is undisputed that Mother sent the Child presents at Christmas in 2024.

Mother testified that she communicated via email messages (1) in August 2021 regarding school uniforms and supplies the Child had left at her home, (2) in September 2021 concerning a "child support card" that she purportedly told Father he could pick up from her mailbox, and (3) in September 2021 with an offer to send $300.00 via Western Union. Mother stated that she received no response to the email messages, and she did not provide documentary proof of them. Father testified that he had sent a response to Mother's message about the $300 and requested that she send the funds via "CashApp" instead. According to Father, Mother had agreed but then never sent the funds.

Regarding her income, Mother testified that she had been employed at National Guard Products from February 2018 to June 2021, earning approximately $3,300.00 per month, and had been employed at Nike full-time from June 2021 through January 2023, earning $21.50 per hour. Mother acknowledged that she had received "COVID-related benefits" for the Child in 2020 and 2021 when the Child was not residing with her.

Father and Stepmother each testified that the Child was flourishing in their home. At the time of trial, the Child was in fourth grade at an elementary school she had been attending since the second grade. Father indicated that the Child struggled academically with some subjects but was receptive to help from Petitioners with her homework. The Child was a junior usher at Petitioners' church and was involved there with a dance team and youth ministry. Stepmother testified that she typically introduced the Child to others as her "baby," and Father confirmed that Stepmother and the Child shared a strong bond. The Child testified that she had a "mom" relationship with Stepmother and felt close to her siblings, including Petitioners' other children and grandchild as well as Mother's other children. The Child stated that ideally she would continue to reside with Petitioners but be allowed to visit Mother and her siblings on Mother's side of the family.

In a final order entered on June 16, 2025, the trial court determined that Petitioners had proven, by clear and convincing evidence, the statutory ground of abandonment by failure to financially support the Child. However, the court found that Petitioners had failed to prove the ground of persistence of the conditions leading to removal of the Child. Having concluded that one ground for termination existed, the trial court analyzed the statutory best interest factors and determined that clear and convincing evidence demonstrated that termination of Mother's parental rights was in the Child's best interest. The court made express credibility findings in favor of Petitioners when their testimony and Mother's differed. Mother timely appealed.

## II. Issues Presented

Mother presents three issues on appeal, which we have restated slightly:

1.  Whether the trial court erred in its findings of fact regarding a cell phone purportedly belonging to the Child.

2.  Whether the trial court erred in finding by clear and convincing evidence that Mother had abandoned the Child through failure to financially support her in the four months preceding the filing of the termination petition.

3.  Whether the trial court in finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The

trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182

S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

### IV. Statutory Ground of Abandonment by Failure to Support

Tennessee Code Annotated 36-1-113 (West July 1, 2021, to June 30, 2022) lists the statutory requirements for termination of parental rights, providing in relevant part:[3]

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4 . . . .

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

---

[3] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the termination petition was filed in the trial court and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at \*4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, as here, the subsection that was in effect at that time has not changed.

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of the statutory ground of abandonment through failure to financially support the Child.

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to the statutory ground at issue here, Tennessee Code Annotated § 36-1-102(1) (West July 1, 2021, to May 8, 2022) defines abandonment in pertinent part as:

(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Petitioners filed the termination petition on February 17, 2022. The trial court found that the relevant four-month period pursuant to the statute was October 16, 2021, through February 16, 2022. However, the beginning point of this time period should be October 17, 2021, rendering a statutorily determinative period spanning October 17, 2021, through February 16, 2022 ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016) (explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Because we find that this one-day difference in the beginning of the Determinative Period does not affect our analysis of this statutory ground, we conclude that the trial

court's inclusion of the extra day constitutes harmless error. *See, e.g.*, *In re Kierani C.*, No. E2020-00850-COA-R3-PT, 2021 WL 4057222, at *8 (Tenn. Ct. App. Sept. 3, 2021).

In its final order, the trial court determined that Mother had waived the affirmative defense of lack of willfulness as to this ground because she "did not plead the defense of lack of willfulness in her answer or via motion." Mother has not disputed this finding on appeal. Tennessee Code Annotated § 36-1-102(1)(I) provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

In her notice of affirmative defense, Mother raised lack of willfulness solely as to the statutory ground of failure to visit the Child. Therefore, we discern no error in the trial court's finding that Mother had waived the affirmative defense of lack of willfulness as to the ground of failure to support the Child. *See, e.g.*, *In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (determining that the parent had waived the affirmative defense of lack of willfulness by failing to raise it in his responses to the termination petition).[4]

The trial court stated the following specific findings of fact and conclusions of law regarding this ground:

> The Court concludes that the proof established that Mother was gainfully employed and received governmental benefits for [the Child] during the Determinative Period, and that her failure to provide support to [the Child] was willful in that Mother was aware of her duty to support [the Child], that Mother had the capacity to provide support, that Mother made no attempt to provide support for [the Child], and that Mother had no justifiable excuse for not providing support for [the Child].

---

[4] Under certain circumstances, this Court has deemed lack of willfulness as to failure to visit or support to have been tried by implied consent, pursuant to Tennessee Rule of Civil Procedure 15.02, when the parent clearly presented evidence at trial regarding lack of willfulness without objection from the petitioner. *See, e.g.*, *In re Elijah F.*, No. M2022-00191-COA-R3-CV, 2022 WL 16859543, at *6 n.7 (Tenn. Ct. App. Nov. 10, 2022); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *8 (Tenn. Ct. App. Nov. 10, 2021). In this case, however, the trial court expressly stated in its final order that Mother had not raised the affirmative defense of lack of willfulness as to failure to support, and we find insufficient evidence in the record that the defense was tried by implied consent.

Mother testified she was working at Nike full time from June 2021 through January 2023 earning $21.50 per hour, or $860 per week. Prior to that, Mother was making $3,300 per month working at National Guard Products. Mother additionally testified that she received COVID-related benefits during the Determinative Period when [the Child] resided with Father based on [the Child] being her dependent, which she did not reimburse to Father.

Mother bases her claim that she supported [the Child] during the Determinative Period on her contention that she paid for a cell phone for [the Child], which she alleged had a cracked screen. Mother produced no phone bills or receipts substantiating these alleged payments. Father testified that [the Child] had not had a phone provided by Mother for years, and [the Child] herself denied having a phone with a cracked screen. [The Child] testified that the only phone she knew of was one she was given by Father and Step-Mother for her birthday in 2023. The Court does not find credible Mother's testimony regarding her payments for a cell phone for [the Child]—and even if she had done so, it provided no benefit to [the Child].

Mother had the ability to provide support for [the Child] during the relevant four-month period and failed to do so. Mother knew where Father resided and could have sent payments to his home, or through his counsel as the parties were in active litigation at the time. Mother made no attempt (other than sending an email, which is no real attempt) to provide support, and therefore has no justifiable excuse for failing to provide support for [the Child].

The Court finds by clear and convincing evidence that Mother abandoned [the Child] by willfully failing to financially support her for a period of four (4) consecutive months immediately preceding the filing of the Petition[.]

(Paragraph numbering omitted.) We determine that the record supports the trial court's findings as to this statutory ground.

Tennessee Code Annotated § 36-1-102(1)(D) defines "failed to support" or "failed to make reasonable payments toward such child's support" as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child" and provides that the parent's ability to make only small payments is not a defense "if no payments were made during the relevant four-month period." Token support "means that the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn.

- 11 -

Code Ann. § 36-1-102(1)(B). "This Court has previously held that support need not be solely monetary, but can include in-kind gifts." *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *18 (Tenn. Ct. App. July 21, 2021) (citing *In re Kaleb N.F.*, No. M2012-00881-COA-R3-PT, 2013 WL 1087561, at *23 (Tenn. Ct. App. Mar. 12, 2013)).

Mother focuses her argument on the first issue she has raised on appeal concerning her alleged provision of a cell phone to the Child. Mother testified that when the Child returned to Petitioners' home in June 2021, the Child had a cell phone with her and that Mother paid $100 monthly for the Child's cell phone through February 2025. Mother argues that the trial court erred in its factual findings concerning the cell phone and, in turn, erred by failing to analyze whether the cell phone constituted token support given Mother's means. Petitioners respond that the trial court properly found that Mother had not proven that she had paid the cell phone bill during the Determinative Period. Accordingly, Petitioners contend that the trial court was correct in not reaching an analysis of token support. Upon careful review, we agree with Petitioners on this issue.

Mother challenges the following factual findings that the trial court made in its final order when summarizing Father's testimony:

> Father denied that [the Child] had used a phone purchased by Mother. The phone Mother provided, which had a broken screen, would not work after the first few months [the Child] came to live with them.

Mother notes Father's testimony that the cell phone provided by Mother had "been broke probably after the first couple of months [the Child] got to the house, it didn't come on." Mother asserts that "both of the witnesses who recalled the phone (Mother and Father) testified that it came with [the Child] in 2021, and neither Mother nor Father described the phone as having a cracked screen." Apparently relying on the distinction between a "broken" phone and a "cracked" screen, Mother urges this Court to determine that the trial court erred in making the above factual finding.

However, Father also testified: "[W]hen [the Child] came there her phone was <u>cracked up</u> and broke. And so she never used it, so it's sitting there. That's why she has her own phone." (Emphasis added.) By "her own phone," Father was referring to a cell phone that he had purchased for the Child.[5] Although Stepmother testified that she was not certain if the Child possessed a cell phone when the Child first joined their household in 2018, Stepmother also testified that "later" the Child did have a phone that was "cracked" and was not in good working order. Contrary to Mother's assertion, Stepmother did appear

---

[5] The Child testified that she did not remember possessing any cell phone other than the one Father had given her.

- 12 -

to remember the cell phone that Mother left with the Child in 2021 but did not identify the year. We discern no error in the trial court's factual findings regarding the cell phone that Mother left with the Child at Petitioners' home in 2021.

Moreover, the trial court found that Mother had "produced no phone bills or receipts substantiating these alleged payments" for the cell phone, and the court expressly found Mother's testimony that she had paid the cell phone bill not credible. The record supports the court's finding that Mother provided no documentary evidence to support her claim, and we will not disturb the court's finding concerning Mother's credibility. *See Jones*, 92 S.W.3d at 838 ("This Court accords deference to the trial court's determinations regarding credibility."). Because the trial court determined that the evidence did not preponderate in favor of a finding that Mother had paid the cell phone bill for the Child, the court did not err by declining to analyze whether the cell phone would have constituted token support given Mother's means.

Apart from her claim regarding the cell phone, Mother admits that she did not provide support to the Child during the Determinative Period. As Mother acknowledges, the lack of a court order directing her to pay child support in this case does not excuse her failure to pay support. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]").

Mother provided no proof of payment for the cell phone or any other type of monetary or in-kind support. She did not raise an affirmative defense of lack of willfulness grounded in an inability to pay. Mother also has not disputed that she only provided gifts to the Child during Christmas 2024, which was outside the Determinative Period. Furthermore, the trial court concluded that Mother maintained the ability to pay some support for the Child. Based on Mother's testimony regarding her employment, the court found that Mother had been earning approximately $860 in gross income per week during the Determinative Period and had collected federal benefits for the Child related to the COVID-19 pandemic. Mother does not dispute these findings.

Mother asserts that the no-contact order presented an insurmountable obstacle that prevented her from sending child support funds to Petitioners, but this argument is grounded in lack of willfulness, the affirmative defense waived by Mother. *See In re Ashlynn H.*, 2021 WL 2181655, at *4. Additionally, the trial court found that Petitioners had been represented by counsel throughout the Determinative Period but that Mother had not attempted to pay support through Petitioners' counsel. The court further found that Mother's attempt to email an offer to pay support to Father had been "no real attempt" at paying support, and the testimony supports this finding. *See id.* ("Even had the defense not been waived, the burden fell on Father to prove his failure to support was not willful."). We therefore conclude that the evidence does not preponderate against the trial court's

- 13 -

determination by clear and convincing evidence that Mother abandoned the Child by failing to financially support her during the Determinative Period.

## V. Best Interest of the Child

When, as here, a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) lists the following factors for consideration:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)     Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final judgment, the trial court made detailed findings regarding the best interest factors and concluded that fourteen factors weighed in favor of terminating Mother's parental rights, two weighed against, and four were neutral or inapplicable. Upon careful review of the evidence presented, we determine that clear and convincing evidence established that termination of Mother's parental rights was in the Child's best interest.

Mother contends that the trial court overemphasized three "themes" when analyzing the best interest factors: (1) Mother's criminal history, (2) the effect of the 2021 no-contact order on Mother's relationship with the Child, and (3) the significance of the January 2025 orders of protection in relation to Mother's ability to co-parent with Father. Petitioners acknowledge that these three themes were present in the trial court's analysis, but they argue that the trial court also included concerns for the Child's "stability and safety" and Mother's "chaotic behavior, instability, history of misconduct, and disregard of Court orders." We will consider the parties' arguments as they are applicable to each best interest factor.

Factors (A), (C), and (J) are related by reason of their emphasis on the Child's stability and safety. The trial court determined that factor (A) (the Child's critical need for stability and continuity of placement) weighed in favor of termination. Noting that the Child had been "in Petitioners' care continuously since June 2, 2021, when she was six (6)

- 17 -

years old," the court found Petitioners' home to be "a loving, safe, and stable home environment." The court recognized the Child's testimony that "she wants to continue to reside with Father and Step-Mother." As to Mother, the court concluded that her "repetitious, unstable, chaotic, and hostile behavioral tendencies would be detrimental to [the Child's] need for stability." Expressing concern over Mother's violation of the no-contact order in December 2024, the court "question[ed] whether the training that DCS [had] provided Mother [had] proven effective." The court concluded that termination of Mother's parental rights would "allow [the Child] to remain in her current safe and stable environment without the undue disruption that would result from accommodating a visitation schedule with Mother."

Relatedly, the trial court found that factor (C) (whether the parent has demonstrated continuity and stability in meeting the child's needs), weighed in favor of termination. The court recognized that Mother "appear[ed] to have demonstrated an ability to meet [the Child's] *basic* material and housing needs." The court also found that Mother had "demonstrated a sensitivity to [the Child's] educational needs by allowing [the Child] to reside with Petitioners to attend Head Start when Mother enjoyed legal custody." However, the court emphasized that the Child had "not resided with Mother in approximately four years." The court further found that Mother had "continued to disregard court orders, which reflects poorly on Mother's judgment." In contrast, the court stated that in addition to demonstrating continuity and stability in meeting the Child's "basic requirements," Petitioners had "demonstrated that they can, and do, go beyond those basic requirements, in which each member of the family, including also [the Child's] adult sister and [the Child's] teenage niece, provide consistent role models for [the Child] as she matures into adolescence."

The trial court also determined that factor (J) (whether the parent has demonstrated a lasting adjustment) weighed in favor of termination. The court concluded that Mother had made "adjustments of circumstances, conduct, or conditions necessary to make it safe, but not so beneficial for [the Child] to be returned to Mother's home." The court recognized that Petitioners had presented no proof of criminal activity or substance abuse in Mother's home and that Mr. Fields had testified that Mother had "achieved improvements in her capacity to provide safety and stability in her home." The court weighed the fact that DCS had now allowed K.T. and B.T. to reside with Mother against the evidence that N.T. was still in foster care and that Mother had pled guilty to child abuse involving N.T. on two occasions. The court credited Mr. Fields's testimony that "Mother has a strong desire to parent as evidenced by her completion of all recommended classes and programs." However, the court considered that in addition to the child abuse convictions, Mother "recently [had] two separate Orders of Protection . . . entered against her" and that Mother had been "charged with a separate assault" during the pendency of this case. The court concluded: "While Mother has demonstrated to the satisfaction of DCS that she has made a positive adjustment of circumstances, conduct, or conditions to

make it safe for K.T. to be in the home of Mother, the Court concludes that such would fail to serve [the Child's] best interests."

Mother argues that the trial court overemphasized her 2024 violation of the no-contact order, her recent assault charge, and the subsequent entry of orders of protection against her in favor of Petitioners. We disagree. The court credited Mother with her accomplishment in establishing a home wherein the Child's basic material and housing needs could be met but found this to be offset by Mother's lack of judgment and "repetitious, unstable, chaotic, and hostile behavioral tendencies." At Christmas 2024, with the termination trial on the horizon, Mother admittedly violated the 2021 no-contact order by giving the Child her telephone number and communicating with the Child for two days before Petitioners had realized what was happening and taken the Child's cell phone. In the January 2025 orders of protection sought, respectively, by Father and Stepmother, the general sessions court found that Mother had stalked Petitioners and "threatened to harm" Father after Petitioners had confiscated the Child's cell phone. By her own admission, Mother had incurred her recent assault charge by entering into an altercation with B.T.'s father's girlfriend. Mother stresses that this assault charge was mutual to the parties and was dismissed, but the trial court noted the incident as evidence that Mother continued to react to conflict in "chaotic" and "hostile" ways. This finding was supported by the evidence. We conclude that the evidence supports the trial court's findings regarding factors (A), (C), and (J).

In weighing factor (B) (the effect a change of caretakers and physical environment would have on the child) in favor of termination, the trial court made the following findings:

> The Court observes that Father's right to retain at least partial custody of [the Child] is not challenged. Were Mother to secure visitation rights, however, her demonstrated history of misconduct makes it likely that Mother would introduce a manipulative approach that may have significant negative effects on [the Child's] emotional welfare. No expert testimony was introduced at trial concerning the psychological or medical effects on [the Child] of a potential change in [the Child's] custodial relationships. Father and Step-Mother testified credibly that removing [the Child] from Petitioner[s'] home and placing her in the home of Mother on a repetitive basis would have a significant negative effect on [the Child's] emotional, psychological, and medical well-being. The Court credits this testimony from Petitioners' first-hand observations of Mother's conduct.

> Due to Mother's history of criminal and/or quasi-criminal behavior which specifically includes the abuse of children, as well as her tendencies toward instability, the Court concludes that subjecting [the Child] to Mother's legal or physical custody would not be in [the Child's] best interest.

- 19 -

The Court concludes that, by a preponderance of the evidence, this factor weighs in favor of termination of Mother's parental rights. Regular removal of [the Child] from Petitioner[s'] home and placement of [the Child] in the home of another caretaker, specifically Mother, would have a significant negative effect on [the Child's] emotional, psychological, and medical wellbeing. Since [the Child] has not resided with Mother in almost four (4) years, placing [the Child] with Mother, even for two weekends per month, would disrupt her life. Further, due to Mother's criminal activity which specifically includes the abuse of children, as well as her instability, placing [the Child] in her legal or physical custody from time to time would pose a risk of substantial harm to [the Child's] physical and psychological welfare. [The Child] lives in a loving, stable environment, where she desires to remain.

Mother asserts that the trial court's findings "reflect [Petitioners'] interests, such as whether they need to deal with Mother in the future, rather than [the Child's] actual interest." To the contrary, we note that the trial court considered whether, after four years apart from Mother, "placing [the Child] with Mother, even for two weekends per month, would disrupt her life," meaning the Child's life. The court also considered Mr. Fields's testimony that DCS had returned K.T. and B.T. to Mother's home, apparently finding the home safe, but the court remained concerned by Mother's "criminal activity" and "instability." Moreover, the court expressly credited Petitioners' testimony regarding Mother's "demonstrated history of misconduct" that the court feared would "make[] it likely that Mother would introduce a manipulative approach that may have significant negative effects on [the Child's] emotional welfare." We determine that the court carefully weighed the credibility of the parties' respective testimonies to reach its conclusion concerning factor (B). *See Jones*, 92 S.W.3d at 838. Furthermore, we conclude that the evidence preponderates in favor of the trial court's findings as to this factor.

Factors (D), (E), (H), and (I) are related due to their emphasis on parental attachments and relationships, and the trial court determined that all four factors weighed in favor of termination. With respect to factor (D) (whether the parent and child have a secure and healthy attachment), the trial court concluded that Petitioners had "established a secure and healthy parental attachment" with the Child but that Mother had not. The court described Stepmother's reaction upon learning of the Child's existence, noting that Stepmother's "first instinct" "was to care for [the Child], an innocent child, by bringing her into their home." The court found that Stepmother and the Child shared a mother-child relationship, a sentiment emphasized by Stepmother, Father, and the Child in their respective testimonies. By contrast, the court found that Mother's 2021 no-contact order, which the court described as "directly related to Mother's abuse of [N.T.]," had "made it impossible for [the Child] to form a secure and healthy parental attachment with Mother." Acknowledging the Child's testimony, the court stated that the Child "has memories that when she resided with Mother when she was much younger, Mother treated her as her

favorite child." However, the court found that "such is not the stuff of a secure and healthy parental attachment." The court determined that "[i]t is not reasonable to expect that Mother can create a healthy parental attachment to the benefit of [the Child]."

As to factor (E) and Mother's visitation with the Child, the trial court concluded:

There has been a "no contact order" in place prohibiting visitation between [the Child] and Mother since September, 2021. Mother's own actions and behavior resulted in this order, due to her abuse and neglect of [N.T.], [the Child's] half-brother. That factor, together with the pendency of this action in Chancery Court, precluded any modification of that order. Additionally, while this matter has been pending, Mother violated the no contact order intentionally, based on Mother's own testimony, resulting in Orders of Protection being granted against her in January 2025. These factors have combined to preclude regular visitation between Mother and [the Child], thereby preventing Mother from cultivating anything other than a superficial relationship with [the Child].

Mother again argues that the trial court's findings reflect an overemphasis on Mother's criminal record, particularly the child abuse conviction stemming from the July 2021 incident with N.T., and an overemphasis on the no-contact order that prevented Mother from visiting the Child. However, as the trial court notes, the no-contact order and the 2025 orders of protection were prompted by Mother's behavior and had resulted in Mother's absence from the Child's life for four years at the time of trial.

Concerning factors (H) (whether the child has created a healthy parental attachment with another person) and (I) (whether the child has emotionally significant relationships with other persons), the trial court found that a "healthy parental attachment" had been created between Stepmother and the Child. The court stated that the Child viewed Stepmother as a "mother figure, and calls her 'Nana,' which she and other children in the family call her." The court recounted the Child's testimony that between Stepmother and Mother, Stepmother "is the one who she would believe, and therefore trust." The court further found that the Child had "developed a close relationship" with Petitioners' adult daughter and teenaged granddaughter, both of whom resided with Petitioners. The Child also testified that she had a close relationship with Petitioners' extended families.

On appeal, Mother emphasizes the Child's stated desire to continue her relationships with all of her siblings on both sides of her family. The trial court addressed this desire, noting that the court had "heard testimony from Father and Step-Mother that they would continue to foster the relationships between [the Child] and Mother's children." The court concluded:

By observing the conduct of the parties, the Court believes that between Petitioners and Mother, Petitioners more likely will foster healthy relationships between [the Child] and her siblings, [K.T.], [N.T.], and [B.T.]. The Court concludes that the likely impact of termination of Mother's parental rights will likely prove to be the outcome that would most positively impact [the Child's] relationship with [K.T.], [N.T.], and [B.T.], as it would decisively forestall Mother's demonstrated tendency to engage in gamesmanship regarding the allocation of parenting time to [the Child's] detriment.

The evidence preponderates in favor of the trial court's findings as to factors (D), (E), (H), and (I), and we agree with the trial court's decision to weigh these factors in favor of termination.

Factors (F) and (G) relate to the Child's previous experiences in Mother's home and any trauma resulting from those experiences. The trial court concluded that these factors weighed neither for nor against termination of Mother's parental rights. Regarding factor (F), the court observed the Child's testimony that "she is not fearful of living in Mother's home" but that "Mother would hit her children, and that she hit [N.T.] so hard he had to be hospitalized." The court stated that it was "not convinced that [the Child] is fearful but rather believes [the Child] might be viewing Mother's home idealistically, because she misses her siblings and longs for a relationship with them." Likewise, concerning factor (G) (whether the parent or parent's home triggers or exacerbates trauma), the court noted that the Child "did not testify or indicate that Mother or her home trigger trauma or post-traumatic symptoms for her." The court found that the Child "testified as to physical abuse she witnessed or experienced from Mother, but not to its effect on her."

We note that "this Court has previously determined that in a situation where the only evidence regarding factors (F) and (G) supports a lack of fear and trauma, the factors weigh against termination of parental rights." *In re Krystopher C.*, No. M2024-00097-COA-R3-PT, 2025 WL 2017077, at *37 (Tenn. Ct. App. July 18, 2025) (citing *In re Layton S.*, No. W2024-00973-COA-R3-PT, 2025 WL 1088253, at *18 (Tenn. Ct. App. Apr. 11, 2025); *In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025)). Here, although the trial court found that the Child did not directly express fear or trauma at the prospect of residing in Mother's home, the court did find that the Child remembered that Mother had disciplined her children by hitting them when the Child lived in Mother's home. The court also cited the Child's knowledge that Mother had hit N.T. hard enough that he required medical treatment. Given this paradox in the Child's testimony, we conclude that the evidence supports the trial court's determination that factors (F) and (G) did not weigh for or against termination in this case.

Factors (K) and (L) both concern services and assistance offered to parents. The trial court determined that factor (K) (whether the parent has taken advantage of available

programs and services) weighed against terminating Mother's parental rights. The court recounted testimony:

> Mr. Fields testified about numerous DCS resources and programs that Mother has accessed both prior to the filing of this Petition and while the termination proceedings have been pending, including parenting assessments, parenting classes, anger management, and counseling. Mother testified that she took an additional anger management course and that she receives individual counseling to deal with her anxiety, stress, and grief. DCS has concluded after performing assessments that Mother is a fit person to parent [K.T.] and [B.T.], and presumably would reach the same conclusion as to [the Child].

We conclude that in weighing factor (K) against termination, the trial court appropriately credited Mother with the work she had done to access services and complete classes and counseling. Because the Child had not been in DCS custody, the trial court found factor (L) (whether DCS had made reasonable efforts to assist the parent) to be inapplicable, and we also agree with this assessment.

Factors (M), (P), (Q), and (R) all relate to Mother's actions to meet the Child's needs. The trial court determined that factors (M), (P), and (Q) weighed in favor of termination, and we agree. With respect to factor (M) (whether the parent has demonstrated a sense of urgency in addressing the conditions that made an award of custody to her unsafe), the trial court recognized that Mother had initially demonstrated a sense of urgency in seeking to establish Father's paternity. The court also found that in seeking custody of the Child, Mother had shown a sense of urgency by undergoing "parenting assessments, parenting classes, anger management, and counseling, as necessary prerequisites of regaining custody of her children, including [the Child]." However, the court stated that it was "troubled by recent conduct of Mother since the filing of the Petition herein." The court explained:

> Mother has pled guilty to an additional charge of child abuse and neglect as well as having two Orders of Protection entered against her and was arrested on an additional assault charge, which indicates to the Court that Mother has failed to demonstrate a sense of urgency in seeking custody of [the Child] or addressing the circumstances, conduct, or conditions that made an award of custody unsafe and not in her children's best interest, including [the Child]. Mother's child [N.T.] remains in DCS custody.

Mother insists that in making these findings regarding her criminal record, the trial court "conflate[d] Mother's report that she had a subsequent charge dismissed with actual criminal activity" and "post-date[d] the issues." Mother does not dispute that she had previously pled guilty to child abuse involving N.T. in 2019. As to the 2023 conviction,

Mother admits that she pled guilty to child abuse in 2023 but emphasizes that the corresponding incident when she struck N.T. occurred in 2021. Mother is correct in that the incident leading to her second child abuse conviction occurred prior to the filing of the termination petition, not after, as the trial court indicated in its final order. However, the trial court properly found two child abuse convictions in Mother's record, and we find any error in the court's finding regarding the timing of the second underlying incident to be harmless. Furthermore, the trial court is not confined to reviewing events occurring during a specific time period in its best interest analysis. *See generally* Tenn. Code Ann. § 36-1-113(i)(1); *see, e.g.*, *In re Liberty T.*, No. E2022-00307-COA-R3-PT, 2023 WL 2681897, at *11 (Tenn. Ct. App. Mar. 29, 2023).

Mother emphasizes her testimony that the "additional assault charge" referred to by the trial court (against B.T.'s father's girlfriend) had been dismissed. Mother thereby urges that the trial court should have discounted any misconduct on her part that did not result in a criminal conviction. We do not find this argument persuasive. Mother acknowledged that she incurred her recent assault charge when she and B.T.'s father's girlfriend were involved in an altercation. Even crediting Mother's testimony that both parties to that altercation were charged with assault and the charges subsequently dropped, the trial court's finding that Mother continued to exhibit volatile methods of dealing with conflict is still valid.

The above facts also apply to factor (P) (whether Mother demonstrated an understanding of the basic needs required for the Child to thrive) and factor (Q) (whether Mother demonstrated the ability and commitment to creating a home that would meet the Child's needs). In its findings as to these two factors, the trial court emphasized the extended period of time, from June 2021 through April 2025, during which Mother had not been in contact with the Child except for their phone conversation in December 2024. The court found that Mother "lack[ed] personal knowledge of [the Child's] personality, accomplishments, development, and aspirations." The court concluded that although "Mother wish[ed] to regain partial custody of [the Child]," she did "not know [the Child] as she [had] grown and matured." The court acknowledged that "Mother may presently have stable housing that is satisfactory" but found that "a home is not just the dwelling" and that Mother had "not provided any proof that she underst[ood] the basic and specific needs required for a child to thrive." The evidence preponderates in favor of the trial court's finding that factors (M), (P), and (Q) weighed in favor of termination.

The trial court determined that factor (R) (the physical environment of Mother's home) should weigh neither for nor against termination. The court referenced Mr. Fields's testimony that "Mother's physical home environment is safe and poses no risks to a child." The court found that "[t]here was limited testimony regarding this issue" and that "this factor is less significant in this circumstance." However, we note that Mother testified that she had lived in her home for "a lot of years" and that it was a four-bedroom home with space for each child currently living there and a home office. Considering that Petitioners

presented no countervailing evidence to demonstrate that the physical environment of Mother's home was unsafe, we determine that this factor should have been weighed against terminating Mother's parental rights. Because of the limited evidence regarding this factor, we find no fault with the trial court's decision to weigh factor (R) as "less significant in this circumstance." *See In re Gabriella D.*, 531 S.W.3d at 682 (explaining that "circumstances of a particular case" may result in the court ascribing different weight to particular statutory factors).

The trial court did weigh factor (O) (whether the parent has ever provided safe and stable care for a child) against terminating Mother's parental rights. The court found that according to Mr. Fields's testimony, Mother had accessed "numerous DCS resources and programs," including "parenting assessments, parenting classes, anger management, and counseling." The court also noted Mother's testimony that she had taken "an additional anger management course and that she receive[d] individual counseling to deal with her anxiety, stress, and grief." Because "DCS [had] concluded after performing assessments that Mother [was] a fit person to parent [K.T.] and [B.T.]," the court found that Mother had provided "safe and stable care" for those two children. We agree with the trial court's assessment of this statutory factor.

With respect to factor (S) regarding child support, the trial court determined that this factor weighed in favor of termination because Mother had not provided financial support for the Child. The court based its determination on the facts pertinent to the statutory ground of abandonment through failure to support, as noted in the preceding section of this Opinion, while also finding that "[t]he only testimony that could be substantiated" as to support "was that Mother [had] sent Christmas gifts in December 2024." The court further found that "Mother could and should have arranged to provide support for [the Child] as she had income from her employment at all relevant times." The evidence preponderates in favor of these findings.

In determining that factor (T) (the parent's mental or emotional fitness) weighed in favor of termination, the trial court found:

> Mother's numerous convictions, including two separate convictions for child abuse and neglect against [the Child's] sibling along with Mother's intentional violation of court orders resulting in the Orders of Protection indicate significant mental and emotional fragility on the part of Mother. The Court concludes that fostering a relationship with Mother at this crucial stage of [the Child's] development would be detrimental to [the Child].

We conclude that the trial court's findings concerning Mother's mental and emotional fitness to parent the Child were supported by the evidence.

- 25 -

Moreover, the trial court determined that factor (N) weighed in favor of terminating Mother's parental rights to the Child because Mother had "pled guilty on two separate occasions to child abuse and neglect of [N.T.]" and because Mother had "pled guilty to two other charges of assaulting other individuals," as well as incurring another "recent charge of assault." The court found that Mother had "a history of violence, which is further corroborated by the recent Orders of Protection entered against her." These findings were supported by the evidence as well.

Although we have determined that the trial court should have weighed factor (R) against termination of Mother's parental rights rather than as a neutral factor, we conclude that the trial court's findings as to all other best interest factors were supported by clear and convincing evidence. The trial court punctuated its best interest analysis by stating:

> The Court resonates with the logic of the Court of Appeals in *In re Chayson D.*, that "[w]hile determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination . . . especially considering the similarities between the factors" the Court ["]cannot help but acknowledge the overwhelming sense["] that [the Child's] life ["]will not be improved by a reintroduction to Mother.["] *See In re Chayson D.*, [720 S.W.3d 123, 146] (Tenn. Ct. App. [] 2023) (citation omitted).

Upon thorough review, we agree with the trial court. We therefore affirm the trial court's determination by clear and convincing evidence that termination of Mother's parental rights to the Child was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Starquesha T.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE